# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 13-CR-2034-LRR |
| Plaintiff, | |
| vs. | **ORDER** |
| MARY ANN RAMOS, | |
| Defendant. | |

_____

## TABLE OF CONTENTS

I.    INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *1*

II.   RELEVANT PROCEDURAL BACKGROUND. . . . . . . . . . . . . . . . . . . . . . *2*

III.  RELEVANT TRIAL EVIDENCE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *3*

IV.   MOTION FOR JUDGMENT OF ACQUITTAL. . . . . . . . . . . . . . . . . . . . . *6*
    A.    *Legal Standard.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *6*
    B.    *Analysis.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *6*
        1.    *XLR-11.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *7*
        2.    *Alpha-PVP.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *9*
            a.    *Applicable law* . . . . . . . . . . . . . . . . . . . . . . *9*
            b.    *Application.* . . . . . . . . . . . . . . . . . . . . . . . *11*

V.    CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *14*

## I. INTRODUCTION

The matter before the court is Defendant Mary Ann Ramos's "Renewed Motion for Judgment of Acquittal" ("Motion") (docket no. 71), following a jury trial after which Defendant was found guilty of distribution of synthetic and analogue controlled substances.

## II. RELEVANT PROCEDURAL BACKGROUND

On April 8, 2014, a grand jury returned a five-count Superseding Indictment (docket no. 29) against Defendant. Count 1 charged Defendant with knowingly and intentionally distributing a mixture or substance containing a detectable amount of XLR-11, a Schedule I controlled substance, in violation of 21 U.S.C. § 841(a)(1). Count 2 charged Defendant with knowingly and intentionally distributing a mixture or substance containing a detectable amount of Alpha-pyrrolidinopentiophenone ("Alpha-PVP"), a Schedule I controlled substance analogue, knowing that the substance was intended for human consumption in violation of 21 U.S.C. §§ 813 and 841(a)(1). Count 3 charged Defendant with knowingly and intentionally possessing with intent to distribute a mixture or substance containing a detectable amount of XLR-11, a Schedule I controlled substance, in violation of 21 U.S.C. § 841(a)(1). Count 4 charged Defendant with knowingly and intentionally possessing with intent to distribute a mixture or substance containing a detectable amount of Alpha-PVP, a Schedule I controlled substance analogue, in violation of 21 U.S.C. §§ 813 and 841(a)(1). Count 5 charged Defendant with knowingly possessing a firearm in furtherance of a drug trafficking crime (possession with intent to distribute a controlled substance analogue, Alpha-PVP), in violation of 18 U.S.C. § 924(c). The Superseding Indictment also contained a forfeiture allegation.[1]

On June 23, 2014, a jury trial commenced on Counts 1-5 of the Superseding Indictment. On June 24, 2014, at the close of the government's evidence, Defendant moved for a judgment of acquittal, and the court reserved ruling. *See* June 24, 2014 Minute Entry (docket no. 59) at 1. On June 25, 2014, at the close of all the evidence, Defendant renewed her motion for a judgment of acquittal and the court reserved ruling. *See* June 25, 2014 Minute Entry (docket no. 60) at 1. On June 26, 2014, the jury returned

---

[1] Defendant stipulated prior to trial that in the event she was convicted on any of the other counts in the Superseding Indictment, she agreed to forfeit the property identified.

guilty verdicts on Counts 1-4 and a not guilty verdict on Count 5. Jury Verdicts (docket no. 67).

On July 8, 2014, Defendant filed the Motion, requesting that the court grant a judgment of acquittal on Counts 1-4. On July 18, 2014, the government filed a Resistance (docket no. 73). Defendant has not filed a reply, and the time for doing so has expired. *See* LCrR 47(a) ("Local Rule 7 governs motion procedure in criminal cases."); LR 7(g) ("[T]he moving party may, within 7 days after a resistance to a motion is served, file a reply brief."). The matter is fully submitted and ready for decision.

### III. RELEVANT TRIAL EVIDENCE[2]

Viewed in the light most favorable to the government, the trial evidence showed that Defendant operated an iWireless store in Cedar Rapids, Iowa, where she sold cellular telephones, cellular telephone accessories, Avon products and various other items such as clothing and candles. In addition to these products, Defendant sold products through the iWireless store that contained XLR-11, a Schedule I controlled substance. She sold these products under names such as "Mr. Happy" and "Mr. Nice Guy."

Apart from the iWireless store, Defendant had a business in which she sold Avon and Scentsy[3] products by taking orders from her customers and personally delivering the products. Defendant would e-mail her customers promoting the Avon and Scentsy products she was selling, and she would provide her customers with receipts for their purchases.

On May 28, 2013, Kelly Meggers and Bryan Furman, task force officers with the Drug Enforcement Administration, conducted a controlled buy at the iWireless store in

---

[2] When relevant, the court relies on and discusses additional facts in conjunction with its legal analysis.

[3] Scentsy products are aromatic candle-burners that, when burned, emit pleasant aromas similar to incense or potpourri.

Cedar Rapids. Officer Furman wore a recording device through which some of the conversation in the iWireless store was captured. Upon entering the store, officers Meggers and Furman asked Defendant if she had potpourri for sale. Defendant walked to a different area in the store and retrieved packages labeled "Mr. Happy" and "Mr. Nice Guy" and showed them to the officers, asking which scent or flavor they preferred. Officers Meggers and Furman paid $26.75 for the package containing "Mr. Nice Guy," which represents $25 plus $1.75 in tax, and Defendant provided the officers with a receipt for the transaction, listing the item sold as "Accessories." Defendant, unprovoked, asked whether Officers Meggers and Furman needed rolling papers. The packaging on the "Mr. Nice Guy" indicated that the substance was not for human consumption, included a list of Schedule I controlled substances that the package purportedly did not contain and stated that it was one hundred percent cannabinoid free and DEA-compliant. Sometime later, the Drug Enforcement Administration tested the "Mr. Nice Guy" and determined it to be XLR-11, a Schedule I controlled substance.

On June 19, 2013, sometime around 9:50 p.m., a confidential informant ("CI") called Defendant and asked to meet. Defendant, unprompted, responded by asking the CI what she was trying to get. The CI stated that she was looking for "Mr. Nice Guy" and whatever "jar" Defendant had. Defendant asked the CI what her price range was, and the CI indicated that she wanted to spend less than $80. Defendant informed the CI that she had a twelve-gram quantity of "Mr. Happy" and a ten-gram quantity of "Insane." Defendant met the CI at a gas station in Waterloo, Iowa, where the CI entered Defendant's vehicle. Defendant sold the CI one package of "Mr. Happy" and one jar of "Blue" for a total of $75. The Drug Enforcement Administration tested the jar of "Blue" and discovered that it contained Alpha-PVP.

On June 26, 2013, law enforcement officers executed search warrants at the iWireless store in Cedar Rapids at which Defendant worked, Defendant's red Ford Edge

4

van and Defendant's residence in Evansdale, Iowa. Officers discovered many packages of synthetic cannabinoid products throughout the iWireless store, including in loose packages in a drawer under a counter, inside a purse-like bag in a cabinet, in a gray bag in the back of a storage room and in a cardboard box under a desk in the back office. The products containing XLR-11 were labeled "Mr. Happy," "Insane," "Mr. Nice Guy," "LOL," "Hydro Kush" and "King Kong." Each of these products included a label indicating that the substance was not for human consumption. Officers also discovered a product labeled "Next Generation" that, when tested, did not contain a controlled substance and smoking paraphernalia such as glass pipes, candy pipes and rolling papers. Under the counter in which the cash register sat, officers discovered a container of "Blue" that tested positive for Alpha-PVP. In Defendant's Ford Edge, officers discovered a synthetic cannabinoid product labeled "Diablo" in the back pocket of the driver's seat and several containers of "Blue" in the rear area. The "Blue" contained Alpha-PVP.

In the basement of Defendant's residence, officers discovered additional products containing XLR-11 as well as additional packages labeled "Blue" that, when tested, were found to contain Alpha-PVP. The jars of "Blue" had labels affixed that indicated that the jar contained scouring powder and the contents of the jar were not for human consumption.

At trial, the government offered the testimony of chemists employed by the Drug Enforcement Administration who testified as to their findings following analysis of the seized substances. Thomas DiBerardino explained the categorization of drugs into Schedules, noting that Schedule I controlled substances are not approved for human consumption. He opined that Alpha-PVP is a controlled substance analogue of MDPV, a Schedule I controlled substance, and that because of its properties, it is not suitable as a cleaning product. Cassandra Prioleau testified that Alpha-PVP is an analogue of MDPV and that both have similar pharmacological effects as cocaine and methamphetamine in that they stimulate the central nervous system.

Mark Harger, a drug user, testified that he had used marijuana, cocaine, methamphetamine and generic or synthetic methamphetamine or cocaine, including the product sold under the brand name "Blue," which he bought from Defendant's son at the Fletcher Liquor Store in Dubuque, Iowa. He testified that the "Blue" had the same effect on him as methamphetamine and cocaine in that it was an "upper."

## IV. MOTION FOR JUDGMENT OF ACQUITTAL

### A. Legal Standard

Federal Rule of Criminal Procedure 29 provides that "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). Such a motion is permitted after trial, in which case the court may set aside the verdict and enter a judgment of acquittal. Fed. R. Crim. P. 29(c). It is well-settled that jury verdicts are not lightly overturned. *See, e.g.*, *United States v. Peneaux*, 432 F.3d 882, 890 (8th Cir. 2005); *United States v. Stroh*, 176 F.3d 439, 440 (8th Cir. 1999). The court must view the evidence in the light most favorable to the government and give the government the benefit of all reasonable inferences. *United States v. Peters*, 462 F.3d 953, 957 (8th Cir. 2006). The court must uphold the jury's verdict so long as a reasonable-minded jury could have found the defendant guilty beyond a reasonable doubt. *Id.* Moreover, the court "must uphold the jury's verdict even where the evidence 'rationally supports two conflicting hypotheses' of guilt and innocence." *Id.* (quoting *United States v. Serrano-Lopez*, 366 F.3d 628, 634 (8th Cir. 2004)). It is not the province of the court to evaluate the credibility of witnesses—that task is for the jury. *United States v. Hayes*, 391 F.3d 958, 961 (8th Cir. 2004).

### B. Analysis

In the Brief in Support of the Motion (docket no. 71-1), Defendant argues that she is entitled to judgments of acquittal on Counts 1 and 3 because the government presented

insufficient evidence that she knew that the XLR-11 was a controlled substance and that she is entitled to judgments of acquittal on Counts 2 and 4 because the government presented insufficient evidence that she knew that the Alpha-PVP was a controlled substance analogue.

### 1. *XLR-11*

Defendant argues that "the evidence was insufficient, as a matter of law, to establish that Defendant knew the substance [containing XLR-11] was a controlled substance . . . as charged in Counts 1 and 3." Brief in Support of the Motion at 2 (emphasis omitted).

"To convict a defendant of violating 21 U.S.C. § 841(a) . . . '[t]he government is not required to prove that the defendant actually knew the exact nature of the substance with which he [or she] was dealing.'" *United States v. Sheppard*, 219 F.3d 766, 769 (8th Cir. 2000) (quoting *United States v. Jewell*, 532 F.2d 697, 698 (9th Cir. 1976) (en banc)). Accordingly, the court instructed the jury that

> [i]t is not necessary that the government prove the defendant knew the substance was XLR-11 as long as she knew the substance was some controlled substance. It is sufficient that the defendant knew that the substance was some kind of prohibited drug. It does not matter whether the defendant knew the identity of the controlled substance.

Final Jury Instructions (docket no. 64) at 15.

Defendant states that the government's evidence was insufficient because at other smoke shops "the salespersons inevitably mentioned customer feedback on the effects of the potpourri, or stated 'They didn't use it,' and even in one instance stated that using the product would not show up on a urinalysis." Brief in Support of the Motion at 3. However, Defendant contends that she never mentioned the potpourri's effects, customer feedback or whether its use would show up on a urinalysis. *Id.* Defendant also argues that the government's evidence as to Defendant's knowledge was limited only to "the claim that agents were offered 'papers' with the sale of the potpourri," and that this evidence "in and

7

of itself does not evidence any knowledge by [Defendant] that the substance was . . . [a] controlled substance." *Id.* at 3-4. Finally, Defendant argues that because "there were several different potpourri labeled products . . . at the [i]Wireless store . . . that contained no controlled substances," the government did not present sufficient evidence that Defendant knew any of the substances contained a controlled substance. *Id.* at 4.

The government argues that it presented sufficient evidence as to Defendant's knowledge of XLR-11 because it produced evidence that Defendant: (1) "stored the synthetic cannabinoid products behind the counter at the [iWireless] store, with no advertisements of their sale, to be sold only on a customer-request basis"; (2) charged an "exorbitant price" for the XLR-11; (3) possessed a large amount of XLR-11 at her business and residence; (4) offered to sell rolling papers to Officers Furman and Meggers; (5) displayed smoking pipes throughout the iWireless store; and (6) "never marketed the synthetic cannabinoid 'incense' products to" her regular customers who bought Avon and Scentsy products. Brief in Support of the Resistance (docket no. 73-1) at 11-13.

The court concludes that the government presented sufficient evidence to support the jury's conclusion that Defendant knew that the XLR-11 products were controlled substances. While others who sell synthetic cannabinoid products often make claims regarding the effects of the products, such claims are not required to show that the seller knows the product he or she is selling is a controlled substance. The court also agrees with Defendant that the fact that one of the "potpourri" products Defendant appeared to be selling did not contain a controlled substance is some evidence that Defendant did not know what she was selling was a controlled substance. However, in light of the government's evidence of the amount Defendant charged for her products, where she stored the products in her store and the fact that Defendant, unprompted, offered Officers Meggers and Furman rolling papers along with the sale of "Mr. Nice Guy," the court concludes that a "'reasonable jury could have concluded that the defendant was guilty

8

beyond a reasonable doubt,'" *United States v. White Bull*, 646 F.3d 1082, 1087 (8th Cir. 2011) (quoting *United States v. Kenyon*, 397 F.3d 1071, 1076 (8th Cir. 2005)), because Defendant knew that the substances she was selling contained a controlled substance. Accordingly, the court shall deny the Motion to the extent it seeks a judgment of acquittal on Counts 1 and 3.

### 2. *Alpha-PVP*

Defendant argues that "the evidence was insufficient, as a matter of law, to establish that Defendant knew the substance [containing Alpha-PVP] was a controlled substance analogue, as charged in Counts 2 and 4." Brief in Support of the Motion at 4 (emphasis omitted).

#### *a. Applicable law*

21 U.S.C. § 841(a) provides that "[it] shall be unlawful for any person *knowingly* or intentionally to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute or dispense, a controlled substance." 21 U.S.C. § 841(a) (emphasis added). 21 U.S.C. § 813 provides that "[a] controlled substance analogue shall . . . be treated . . . as a controlled substance in schedule I." 21 U.S.C. § 813. The United States Code defines a controlled substance analogue as a substance—

> (i) the chemical structure of which is substantially similar to the chemical structure of a controlled substance in schedule I or II;
>
> (ii) which has a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance in schedule I or II; or
>
> (iii) with respect to a particular person, which such person represents or intends to have a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant,

depressant, or hallucinogenic effect on the central nervous system of a controlled substance in schedule I or II.

21 U.S.C. § 802(32)(A). Parts (i) and (ii) are read in the conjunctive, "[t]hus, part (i) must be satisfied and either part (ii) or part (iii) must also be satisfied" to establish that a substance meets the definition of a controlled substance analogue. *United States v. Washam*, 312 F.3d 926, 930 n.2 (8th Cir. 2002). Additionally, substances "not intended for human consumption" are not considered controlled substance analogues. 21 U.S.C. § 802(32)(C)(iv). "When a criminal statute introduces the elements of a crime with the word 'knowingly,' [the Eighth Circuit Court of Appeals] appl[ies] that word to each element of the crime unless special context or background calls for a different reading." *United States v. Nguyen*, No. 13-1455, ___ F.3d ___, ___, 2014 WL 3408673, at *3 (8th Cir. July 15, 2014) (citing *United States v. Bruguier*, 735 F.3d 754, 758 (8th Cir. 2013) (en banc)). *But see United States v. McFadden*, 753 F.3d 432, 444 (4th Cir. 2014) (holding that the jury need not find that the defendant knew that the substance was a controlled substance analogue). Accordingly, the court instructed the jury that

> [t]o prove that the defendant knew that she possessed a controlled substance analogue, the government must prove: (1) the defendant knew that Alpha-PVP was intended for human consumption; and (2) the defendant knew (a) the chemical structure of Alpha-PVP is substantially similar to the chemical structure of a controlled substance in Schedule I or II; and (b) Alpha-PVP either has or was represented by the defendant to have a stimulant, depressant or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant or hallucinogenic effect on the central nervous system as a controlled substance in Schedule I or II.

Final Jury Instructions at 17. Defendant contends that the government failed to prove both that Defendant "knew the chemical structure of Alpha-PVP was substantially similar to that of a Schedule I or II controlled substance" and that Defendant "represented that the 'Blue'

. . . had a stimulant, depressant or hallucinogenic effect on the central nervous system that was substantially similar to or greater than that of a Schedule I or II controlled substance." Brief in Support of the Motion at 5-6.

### b. *Application*

The court concludes that, while a close question, the government presented sufficient evidence for a reasonable jury to conclude that Defendant knew that the "Blue" contained a controlled substance analogue. The government relies on *United States v. Sullivan*, 714 F.3d 1104 (8th Cir. 2013), in which the defendant argued that the government failed to prove that he knew that the substance with which he was charged was a controlled substance analogue. *Id.* at 1107. In *Sullivan*, when the defendant was pulled over and the arresting officer asked whether there was anything illegal in his vehicle, the defendant "responded that the vehicle contained bath powder." *Id.* at 1105. "At the time of arrest, the [controlled substance analogue] in the powder was illegal only . . . as a controlled substance analogue." *Id.* at 1107. The court concluded that the fact that the defendant "indicat[ed] the bath powder was illegal supports a reasonable inference he knew the powder contained a controlled substance analogue." *Id.* Implicit in the Eighth Circuit's reasoning is that when the government presents evidence from which a reasonable jury may infer that a defendant knows that a substance is illegal and the substance is only illegal as a controlled substance analogue, such evidence is sufficient for a reasonable jury to also infer that: (1) the defendant had knowledge that the substance had a substantially similar chemical structure to the chemical structure of a controlled substance in Schedule I or II; and (2) the defendant had knowledge that the substance had a stimulant, depressant or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant or hallucinogenic effect on the central nervous system as a controlled substance in Schedule I or II.

Although the government offered limited evidence as to Defendant's knowledge of the chemical similarity of Alpha-PVP to a controlled substance in Schedule I or II and Defendant's knowledge of Alpha-PVP's pharmacological effects, the court finds that it is bound by the Eighth Circuit's reasoning in *Sullivan*. In *Sullivan*, the government argued that "the jury could reasonably infer the [controlled substance analogue] which [the defendant] admitted possessing" was a controlled substance analogue "based on the price he paid for the product, the packaging and labeling materials he had in his possession, [an officer's] testimony concerning how the product is sold in head shops to people for the purpose of getting high, and the fact [the defendant] sells glass pipes in head shops." Brief of Appellee at 31-32, *United States v. Sullivan*, 714 F.3d 1104 (8th Cir. 2013) (No. 12-1754). Here, the government argues that the jury could reasonably infer Defendant's knowledge based on the high price Defendant charged for the substance and the location and time of day of the sale. *See* Brief in Support of the Resistance at 18-19. In *Sullivan*, rather than relying on the government's argument that a reasonable jury could infer the requisite knowledge from the price of the analogue substance and its labeling, the Eighth Circuit relied solely on the defendant's statement that the substance he possessed was illegal in finding that the defendant had the requisite knowledge that he possessed a controlled substance analogue. *Sullivan*, 714 F.3d at 1107. That is, the combination of the defendant's admission that the substance he possessed was illegal and the fact that the substance was illegal only as a controlled substance analogue permitted the jury to infer that the defendant knew that: (1) the substance had a substantially similar chemical structure to the chemical structure of a controlled substance in Schedule I or II; and (2) the substance had a stimulant, depressant or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant or hallucinogenic effect on the central nervous system as a controlled substance in Schedule I or II.

Here, Defendant did not admit that the "Blue" was illegal. The only evidence presented as to the legality of Alpha-PVP was the government's evidence that Alpha-PVP is illegal as a controlled substance analogue; neither party presented evidence about whether Alpha-PVP may be illegal other than as a controlled substance analogue. Despite the absence of an admission by Defendant as to the legality of the "Blue," the government relies on *Sullivan* and argues that "the evidence of [D]efendant's course of dealings indicated she knew the substances she was distributing were illegal drugs." Brief in Support of the Resistance at 18. In essence, the government argues that the high price and the nature of the sale allows a jury to infer that Defendant knew the Alpha-PVP contained in the "Blue" was illegal and that the "Blue" was only illegal as a controlled substance analogue, and this inference in turn allows the jury to infer that the defendant knew that: (1) the substance had a substantially similar chemical structure to the chemical structure of a controlled substance in Schedule I or II; and (2) the substance had a stimulant, depressant or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant or hallucinogenic effect on the central nervous system as a controlled substance in Schedule I or II. Although the circumstantial evidence that Defendant knew the substance she sold was illegal is different than the defendant's admission in *Sullivan*, the same reasoning applies. Affording the government all reasonable inferences and viewing the evidence in the light most favorable to the government, a reasonable jury could infer from the nature of the transaction with the CI—it occurred at 9:50 p.m., Defendant did not appear to know the CI well and Defendant stated that the CI would be "real happy" when she took a shower following the transaction[4]—that Defendant knew that the "Blue" was illegal, and that the "Blue" was only illegal as a controlled substance analogue. The fact that the government presented evidence that Defendant acted as though the "Blue" "was illegal supports a reasonable

---

[4] Labeling on the "Blue" jar indicated it was a scouring powder.

inference [Defendant] knew the ["Blue"] contained a controlled substance analogue." *Sullivan*, 714 F.3d at 1117. Therefore, a reasonable jury could infer that Defendant knew that the "Blue" was a controlled substance analogue which had a substantially similar chemical structure to a controlled substance in Schedule I or II and which had a stimulant, depressant or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant or hallucinogenic effect on the central nervous system as a controlled substance in Schedule I or II.

## V. CONCLUSION

In light of the foregoing, Defendant Mary Ann Ramos's "Renewed Motion for Judgment of Acquittal" (docket no. 71) is **DENIED**.

**IT IS SO ORDERED.**

**DATED** this 9th day of September, 2014.

LINDA R. READE
CHIEF JUDGE, U.S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA